1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LUKERIA EFIMOFF,

               Plaintiff,

     v.

PORT OF SEATTLE, JOHN AND JANE
DOES 1 THROUGH 10, Inclusive,

              Defendant.

CASE NO. 2:23-cv-01307-BAT

**ORDER GRANTING DEFENDANT
PORT OF SEATTLE'S MOTION
FOR SUMMARY JUDGMENT**

       Defendant Port of Seattle ("the Port") moves for summary judgment pursuant to Fed. R. Civ. P. 56 and dismissal of Plaintiff's claims with prejudice. Dkt. 13. Plaintiff Lukeria Efimoff opposes the motion (Dkt. 20) and the Port filed a reply (Dkt. 23). Having considered the parties' filings, summary judgment evidence, and balance of the record, the Court grants the motion.

<u>INTRODUCTION</u>

       In September 2021, during the deadly Delta wave of the COVID-19 pandemic, the Port imposed a vaccination requirement for Port employees to try to stem the spread of the virus among employees and the community working in and traveling through Port facilities. Ms. Efimoff was a Senior Access Controller, whose job required her to interact closely with others while controlling, monitoring, and restricting access to secured portions of Seattle-Tacoma International Airport ("SeaTac"). Ms. Efimoff sought a religious exemption from the vaccination requirement. The Port concluded it could not reasonably accommodate Ms. Efimoff without

1  imposing an undue hardship on the Port's operations because the essential functions of her

2  position required a daily on-site presence with regular, close interactions with others. Therefore,

3  the Port separated Ms. Efimoff from her employment in November 2021.

4      Ms. Efimoff alleges the Port violated Title VII of the Civil Rights Act of 1964 ("Title

5  VII"), as amended, 42 U.S.C. §2000e, *et seq*., and Washington's Law Against Discrimination

6  ("WLAD"), RCW 49.60.180, *et seq*, by failing to reasonably accommodate her religious

7  objection to the COVID-19 vaccination requirement.

8                          STATEMENT OF FACTS

9      The following recitation of facts is based on evidence before the Court that is either

10 undisputed or, where material factual disputes exist, taken in the light most favorable to Plaintiff.

11 A.    Port of Seattle and Ms. Efimoff's Job at the Port

12     The Port owns and operates an international airport, cruise ship terminals, four marinas,

13 and— with the Port of Tacoma—a marine cargo gateway. Dkt. 18, Declaration of Stephen

14 Metruck, Executive Director of the Port ("Metruck Decl.") ¶ 2. Approximately 50 million

15 passengers pass through SeaTac each year. *Id*. The airport operations are supported by the work

16 of approximately 20,000 employees, working for the Port, contractors, airlines, the TSA, and

17 others. *Id*. Ms. Efimoff was employed as a Senior Access Controller in the Port's Aviation

18 Security department and reported to Laura Tolen, Manager of Physical Security. Dkt. 19,

19 Declaration of Jim Witzman, Senior Manager, Aviation Security Operations ("Witzman Decl.")

20 ¶¶ 2-4. As a Senior Access Specialist, Ms. Efimoff was responsible for a variety of on-site

21 security duties within SeaTac Airport, including tasks related to the control, monitoring, and

22 granting of access to secured portions of the airport. *Id*., Ex. A; *see*, *e.g*., Dkt. 14, Declaration of

23 Shannon Phillips ("Phillips Decl.") ¶2, Ex. A ("Efimoff Dep.") at 32:20-38:19, 47:1-23, 49:4-

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 2

52:1, 52:25-58:5.

Employees in Ms. Efimoff's position are assigned to swing, day, or night shifts and perform a wide range of physical screening and inspection duties at the airport. Dkt. 19, Witzman Decl., Ex. A; Dkt. 16, Declaration of Katherine Gerard ("Gerard Decl."), Ex. E. In her daily work, Ms. Efimoff could be assigned to "Terminal Assignments," where she was responsible for monitoring and patrolling various checkpoints, passageways, and alarm points throughout the airport and where she worked closely with TSA agents in response to safety or security incidents. Dkt. 16, Gerard Decl., Ex. E; Dkt. 19, Witzman Decl. ¶5. She could also be assigned to "Airfield Deployments," where she was responsible for monitoring and screening personnel and equipment entering the airfield, driving the perimeter, manning gate assignments, and searching vehicles, bags, and property of airport workers and business visitors. Dkt. 16, Gerard Decl., Ex. E; Dkt. 19, Witzman Decl. ¶5. For security reasons, employees are randomly assigned and rotated through locations and assignments, at times within the same work shift. Dkt. 19, Witzman Decl. ¶5.

Because many job functions take place inside the public parts of the airport terminal, Security Access Controllers use amenities such as public restrooms. Dkt. 14, Phillips Decl., Efimoff Dep. 59:21-60:11. They may gather for lunch in employee break rooms or at workstations; and they may also access public food venues. *Id*. 60:13-64:1. Ms. Efimoff testified she rotated to various workstations depending on time and shift; met with coworkers in a breakroom before and after her shift; shared indoor restrooms, locker facilities, and kitchens with coworkers; and searched the inside of vehicles of persons entering Port property and inside bags carried by individuals. *Id*. 23:6-22, 40:8- 13, 47:1-23 59:21-66:19, 37:3-38:14, 125:18-126:20. She would also escort individuals as needed, including medical personnel, construction workers,

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 3

1  and other contractors. *Id.* 51:3-52:23. Ms. Efimoff also inspected card readers throughout the

2  facility and performed routine inspections to ensure the facilities were properly secured. *Id.* 53:2-

3  19, 124:24-125:16. These duties involved moving through public spaces, hallways, escalators,

4  restaurants, and elevators. *Id.* Ms. Efimoff also acknowledged that as part of the screening

5  process, individuals being screened by an employee in Ms. Efimoff's position needed to lower or

6  remove their mask to be identified. *Id.* 77:7-11.

7  B.    The COVID-19 Pandemic and Development of Vaccines

8         COVID-19 is a highly contagious, potentially deadly, respiratory illness caused by a virus

9  that spreads primarily person-to-person. *Slidewaters LLC v. Wash. State Dep't of Labor &*

10 *Indus.*, 4 F.4th 747, 752 (9th Cir. 2021). Transmission may occur even when the infected person

11 does not have symptoms and does not know of the infection. *Id.* In February 2020,

12 "[g]overnments at all levels instituted restrictions to curb the transmission of the virus." *Id.*

13 Between December 2020 and February 2021, the FDA issued Emergency Use Authorizations

14 ("EUAs") for three COVID-19 vaccines developed by Pfizer, Moderna, and Johnson & Johnson

15 ("J&J"). Dkt. 17, Declaration of John Lynch ("Lynch Decl.") ¶¶13-15. The FDA gave full

16 approval to Pfizer's vaccine for people 16 and older in August 2021. *Id.* ¶¶24-25; *Church v.*

17 *Biden*, No. CV 21-2815 (CKK), 2022 WL 1491100, at *2 (D.D.C. May 11, 2022).

18        Based on clinical trials used for FDA approval involving more than one million

19 volunteers, the Pfizer vaccine's efficacy was 95%; Moderna, 94%; and J&J, 67%—each well

20 exceeding the 50% efficacy baseline for EUA. *See* Dkt. 17, Lynch Decl., ¶¶19-21. After

21 collecting data in real world use, in April 2021 Pfizer announced its vaccine continued to have a

22 significant protective effect (91.3%) against COVID-19 symptomatic infection six months after

23 the second dose. It was also found to continue to be between 95 and 100% effective in

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 4

1    preventing severe disease six months after the second dose. *See id*. ¶22. Similarly, Moderna

2    announced in April 2021 that its vaccine continued to convey similar levels of protection. *See id*.

3    The extremely high effectiveness of the vaccines in preventing symptomatic infections was

4    important for slowing the spread of COVID-19, as asymptomatic cases have been found to be

5    approximately 60% less transmissible than symptomatic cases, possibly because the lack of

6    coughing, sneezing, and other respiratory symptoms may reduce the spread of respiratory

7    aerosols. *See id*. ¶28.

8        The COVID-19 vaccines' mild side effects are comparable to those for a seasonal flu

9    shot. *See id*. ¶¶19-21, 36. As of fall 2021, the FDA's research and analysis concerning the

10   vaccines' safety and effectiveness found the data to be "clear and compelling" to support the use

11   of the vaccine for the prevention of COVID-19. *Id*. ¶¶18, 36.

12   C.    The Port Employs COVID-19 Protective Measures and Adopts Vaccine Requirement

13       As an "essential" employer with massive role in regional transportation and commerce,

14   the Port responded swiftly and seriously to the COVID-19 pandemic to protect the health of Port

15   employees and visitors and to maintain business operations. *See generally* Dkt. 18, Metruck

16   Decl.; Dkt. 15, Declaration of Teresa Cummins, Director of Health and Safety ("Cummins

17   Decl."). In March of 2020, the Port's Executive Director Stephen Metruck declared an

18   emergency under the Port's "Workplace Disruption" policy. Dkt. 18, Metruck Decl. ¶4. This

19   entailed temporary suspension of non-essential business functions and a telework policy for

20   those employees able to work remotely. *See id*. Despite the "Workplace Disruption," the

21   majority of the Port's 2,200 employees were "essential critical infrastructure workers" under

22   Governor Jay Inslee's emergency proclamations, with at least half of these "critical" employees

23   unable to telework due to the nature of their roles. *Id.*, Metruck Decl. ¶5; Dkt. 16, Gerard Decl.

1  ¶5. Thus, the Port's "essential" workers were required to continue to have in-person interaction

2  with other personnel and the public to perform their job duties. Dkt. 18, Metruck Decl. ¶5.

3  Examples include police officers, security personnel and screeners (such as Ms. Efimoff), bus

4  drivers, mechanics, customer service staff, and the many other jobs necessary to maintain Port

5  operations. *Id*. The Port developed and implemented COVID-19 procedures and policies based

6  on public health data and guidance from public health authorities such as the Center for Disease

7  Control and Prevention ("CDC"), the King County Department of Health ("King County DOH"),

8  the Washington Department of Labor & Industries, Division of Occupational Safety and Health

9  ("L&I"), and the Washington State Department of Health ("Washington DOH"). Dkt. 15,

10  Cummins Decl. ¶¶4-8; *see also* Dkt. 18, Metruck Decl. ¶5; Dkt. 16, Gerard Decl. ¶¶4, 9.

11          The Port adopted comprehensive health and safety protocols, including daily health

12  checks, mandatory facial masking, increased sanitization and hygiene, social distancing, and

13  leave time for quarantine and isolation. Dkt. 15, Cummins Decl. ¶¶6, 8; Dkt. 18, Metruck Decl.

14  ¶5; Dkt. 16, Gerard Decl. ¶¶4-7. When COVID-19 vaccinations became available to the public in

15  Spring 2021, the Port provided information to employees about vaccine efficacy and encouraged

16  employees to get vaccinated to protect their health and the health of other community members.

17  Dkt. 16, Gerard Decl. ¶8. Despite these safety measures, COVID-19 continued to disrupt Port

18  operations well into 2021. *See* Dkt. 15, Cummins Decl. ¶¶9-12. Disruptions to the Port's

19  operations worsened in the Summer and Fall of 2021 with the emergence of the "Delta" variant

20  of the COVID-19 virus, which began to spread quickly in King County in late July 2021. Dkt.

21  17, Lynch Decl. ¶48, Ex. E. Virus cases approached levels last seen in the winter 2020 surge. *Id*.

22  As of July 30, 2021, one in 172 Washington residents was estimated to have an active COVID-

23  19 infection; by August 6, it was 1 in 156. *Id*. ¶48.

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 6

1    Increased COVID-19 infections put a strain on hospitals already dealing with staffing

2    challenges, which was compounded by an increase in staff who tested positive. *Id*. As of

3    September 2021, about 95% of COVID-19 patients who were hospitalized were not fully

4    vaccinated. *Id*. ¶48. This was likely because COVID-19 vaccines provided strong protection

5    against infection during the Delta phase, with vaccine efficacy rates up to high 80s%. *Id*.

6    According to data from the Seattle and King County Department of Public Health, "[i]n the

7    period leading up to December 2021, in King County unvaccinated persons were 4.5x more

8    likely to test positive for COVID-19 than fully vaccinated persons, 32x more likely to be

9    hospitalized, and 40x more likely to die." Dkt. 17, Lynch Decl. ¶48, Ex. F.

10    In June 2021, there were zero COVID-19 cases reported among Port employees, and in

11    July 2021 there were only four. Dkt. 15, Cummins Decl. ¶15. In the month of August 2021, 25

12    Port employees and 32 contractors reported COVID-19 diagnoses. Dkt. 18, Metruck Decl. ¶8,

13    Ex. C; Dkt. 15, Cummins Decl. ¶15. This data relies exclusively on self-reporting, and almost

14    certainly underestimates the number of positive cases among Port employees, many of whom

15    may have been asymptomatic and not suspected they had contracted COVID-19, or who chose

16    not to share their personal health information. Dkt. 15, Cummins Decl. ¶15.

17    In September and October 2021, employees who tested positive had to quarantine for 10

18    days. Dkt. 15, Cummins Decl. ¶11. An employee who was exposed to someone with COVID-19

19    had to quarantine for up to 14 days. *Id*. For the many employees whose jobs must be performed

20    in person, that meant they could not perform their job functions. From the start of the pandemic

21    through October 29, 2021, the Port was aware of 177 employees who had tested positive for

22    COVID-19; and 882 employees who had been exposed to COVID-19. *Id*. As of October 2021,

23    the total lost calendar days of all employees due to isolation and quarantine was 12,122, or

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 7

1    approximately 96,976 hours. *Id.* Faced with the large increase in positive COVID-19 cases

2    during the Delta wave and increased disruption of Port operations, Port management began to

3    discuss whether it should impose a vaccine requirement on employees. Dkt. 16, Gerard Decl. ¶9;

4    Dkt. 15, Cummins Decl. ¶¶12-21; Dkt. 18, Metruck Decl. ¶¶6-12. The Port's management

5    monitored decisions by the Washington State, King County, and City of Seattle governments,

6    and other entities, to require employees to obtain vaccinations as a condition of employment.

7    Dkt. 15, Cummins Decl. ¶17; Dkt. 16, Gerard Decl. ¶9; Dkt. 18, Metruck Decl. ¶¶6, 11-12. The

8    Port also monitored data from the CDC, King County DOH, Washington DOH, and Port of

9    Seattle workforce data, regarding the rise in positive COVID-19 cases attributable to the Delta

10   variant. Dkt. 15, Cummins Decl. ¶¶15, 18, 20-21; Dkt. 16, Gerard Decl. ¶9; Dkr. 18, Metruck

11   Decl. ¶¶10-11. The Port's management noted that data from this "region indicated that

12   unvaccinated persons were at a much higher risk of transmitting and contracting COVID-19 and

13   constituted the overwhelming majority of not only confirmed cases, but also hospitalizations and

14   fatalities." Dkt. 15, Cummins Decl. ¶18; Dkt. 18, Metruck Decl. ¶11.

15         On September 14, 2021, the Port adopted a mandatory vaccination policy, Human

16   Resources Policy No. 34 ("HR-34"). Dkt. 16, Gerard Decl. ¶10, Ex. A; Dkt. 15, Cummins Decl.

17   ¶¶14-21. Mr. Metruck explained the reasons for the policy in an email to employees. Dkt. 18,

18   Metruck Decl. ¶12, Ex. E.

19   D.    The Port's Exemption and Accommodation Process

20         HR-34 required all employees to be fully vaccinated against COVID-19 by November

21   15, unless exempt and accommodated. Dkt. 16, Gerard Decl., Ex. A. The policy allowed for

22   exemptions and accommodations for employees with "(a) an underlying medical condition or

23   disability that contraindicates administration of the COVID-19 vaccine, or (b) an objection based

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 8

1  upon a sincerely held religious belief," so long as a "reasonable accommodation can be

2  provided" that "does not create an undue hardship for the Port" or "pose a direct threat to the

3  health or safety of others." *Id.* at 3. The exemption and accommodation process for religious

4  beliefs involved three steps. First, employees were provided with the Port's "COVID-19

5  Vaccination Religious Exemption/Accommodation Request Form," which explained the process

6  and included space for employees to substantiate their need for a vaccination exemption. *Id.*,

7  Gerard Decl., Ex. B. Second, once a request for a religious exemption was approved, the Port

8  sent the requesting employee's manager a form titled "Vaccine Exemption Request

9  Questionnaire," which was used to collect information on job duties and the work environment

10  to assess possible accommodation options. *Id.*, Gerard Decl. ¶13, Ex. C. Information collected

11  included whether the requesting employee had been able to telework, essential job functions

12  requiring an on-site presence, and whether the employee's job required interaction with others.

13  *Id.*, Ex. C. Third, once the questionnaire was completed, the Port's HR Department reviewed the

14  information and considered the costs of possible accommodations, including the impact on daily

15  operations and impaired workplace health and safety, before making an ultimate decision as to

16  whether it would be possible to accommodate the employee without imposing an undue burden.

17  *Id.*, Gerard Decl. ¶¶13-14. Employees then had the opportunity to participate in a meeting to

18  share any additional information they would like considered before the Port made a final

19  decision regarding their employment status. *See id.* ¶¶12, 19.

20  E.    The Port Determines Accommodating Efimoff Would Impose an Undue Burden

21         Ms. Efimoff was one of 114 Port employees who requested an exemption from and

22  accommodation with respect to the vaccination requirement. Dkt. 16, Gerard Decl., ¶13. When

23  she submitted her accommodation request on October 18, 2021, Ms. Efimoff did not identify any

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 9

1  specific accommodation options. *See generally* Dkt. 16, Gerard Decl. ¶15, Ex. D. During her

2  deposition, Ms. Efimoff testified the Port could have accommodated her by allowing her to test

3  for COVID-19 and stay home when sick. Dkt. 14, Phillips Decl., Efimoff Dep. 129:5-130:7. As

4  part of its evaluation, the Port asked Ms. Efimoff's supervisor, Laura Tolen, to complete the

5  Port's "Vaccine Exemption Request Notice/ Questionnaire." Dkt. 16, Gerard Decl. ¶16, Ex. E.

6  Ms. Tolen provided detail about Ms. Efimoff's job duties and work environment, including that

7  Ms. Efimoff was not permitted to telework during the "Workplace Disruption"; she reported on-

8  site for each work shift and worked on-site 84 times during the pandemic; she was relied upon to

9  perform vital on-site security functions that could not be performed off-site; and she was

10  regularly required to interact with travelers, coworkers, contractors, vendors, and other members

11  of the public at various checkpoints, gates, and security locations throughout SeaTac. *Id.*,

12  Efimoff Dep. 120:21-126:20 (confirming statements Ms. Tolen made in questionnaire regarding

13  essential functions). As explained by Ms. Tolen and Mr. Witzman, Ms. Efimoff's role required a

14  physical presence at the regularly crowded SeaTac airport each workday, making telework not

15  feasible. Dkt. 16, Gerard Decl. ¶16, Ex. E; Dkt. 19, Witzman Decl. ¶¶4-7. It also meant that Ms.

16  Efimoff would come into close contact with other Port employees, tenant employees, vendors,

17  and others who spend time at the airport. Dkt. 16, Gerard Decl. ¶16, Ex. E; Dkt. 19, Witzman

18  Decl. ¶¶4-7.

19      The Port's HR Department also considered the scientific data establishing that an

20  unvaccinated individual posed a greater risk of transmission to others and a greater risk of severe

21  infection to themselves. Dkt. 16, Gerard Decl. ¶¶13-14, 16-17; *see also* Dkt. 15, Cummins Decl.

22  ¶18. Teresa Cummins, Director of Health and Safety, provided guidance to the Port's HR

23  Department and Executive Team regarding the effectiveness and feasibility of other safety

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 10

measures for preventing the transmission of COVID-19, such as masking, social distancing, and testing. *See* Dkt. 15, Cummins Decl. ¶23; Dkt. 16, Gerard Decl. ¶¶9, 14. The Port ruled out weekly or daily COVID-19 testing as a possible accommodation option for unvaccinated employees because it was neither safe nor feasible. Dkt. 16, Gerard Decl. ¶17. Ms. Cummins explained testing in lieu of vaccination had serious shortfalls, including decreased workplace health and safety, administrative burdens, and increased costs, and that "testing like [the Port's] other public health measures, is a complement rather than a substitute for vaccinations." Dkt. 15, Cummins Decl. ¶23. The Port also ruled out masking as a possible accommodation option for unvaccinated employees because of known limitations on the effectiveness of masking: mandatory masking requirements had already been shown to be ineffective to slow the spread during the Delta wave; the Port could not guarantee that employees would always wear their masks during the workday or require masking outside of work; and scientific data establishing that masking is not a sufficient substitute for the protections provided by vaccination. *Id*. ¶24; *see* Dkt. 16, Gerard Decl. ¶17. Additionally, for employees who had to work in person in public areas at busy Port-run facilities, such as SeaTac, social distancing was not possible. Dkt. 15, Cummins Decl. ¶24; *see* Dkt. 16, Gerard Decl. ¶17. In addition, social distancing proved to be of limited effectiveness in preventing the spread of COVID-19 because the aerosolized COVID-19 virus can be transmitted over distances of greater than six feet, and particles from an infected person can move throughout an entire room or indoor space. Dkt. 15, Cummins Decl. ¶24; *see* Dkt. 17, Lynch Decl. ¶¶28, 42, 53.

On November 8, 2021, the Port's HR Department sent Ms. Efimoff a letter explaining that it would not be able to accommodate her in performing her Senior Access Controller duties unvaccinated without imposing an undue hardship on the Port "by negatively impacting

1   workplace safety and posing a threat to the health and safety of employees and their families, the

2   community, visitors, and others who spend time in Port facilities." Dkr. 16, Gerard Decl. ¶17,

3   Ex. F. Ms. Efimoff received a Notice of Proposed Non-Disciplinary Separation of Employment

4   on November 15, 2021, and was provided with the opportunity to participate in a *Loudermill*

5   hearing on November 16, 2021, and provide additional information for consideration. Dkt. 16,

6   Gerard Decl. ¶19, Ex. G. After the *Loudermill* hearing, the Port reaffirmed its earlier conclusion

7   and informed Ms. Efimoff that she was being separated because she did not meet the current job

8   requirement of vaccination, and the Port had determined it could not reasonably accommodate

9   her religious objection to the requirement without undue hardship. Dkt. 16, Gerard Decl. ¶20, Ex.

10   H. Ms. Efimoff was separated from the Port effective November 16, 2021. *Id.*

11   F.    Ms. Efimoff's Lawsuit

12        On June 9, 2023, Ms. Efimoff filed her complaint in state court against the Port and

13   "Does 1-10." Dkt. 1-1. Ms. Efimoff asserted two causes of action: (1) a failure to accommodate

14   her religious beliefs in violation of Title VII; and (2) a parallel claim under WLAD. *Id.* The Port

15   removed the case to this Court on August 23, 2023. Dkt. 1.

16                     DISCUSSION

17   A.    Legal Standard for Summary Judgment

18        Summary judgment is appropriate when, viewing the facts in the light most favorable to

19   the nonmoving party, there is no genuine issue of material fact that would preclude the entry of

20   judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial

21   responsibility of informing the district court of the basis for its motion," *Celotex Corp. v. Catrett*,

22   477 U.S. 317, 323 (1986), and "citing to particular parts of materials in the record" that show the

23   absence of a genuine issue of material fact, Fed. R. Civ. P. 56(c). Once the moving party has

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 12

1    satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate

2    "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324.

3    The nonmoving party cannot "defeat summary judgment with allegations in the complaint, or

4    with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343

5    F.3d 1107, 1112 (9th Cir. 2003). Rather, the nonmoving party must "go beyond the pleadings

6    and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

7    file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S.

8    at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the

9    moving party is entitled to judgment as a matter of law. *Id.* at 325.

10    B.    Motions to Strike

11    "A trial court can only consider admissible evidence in ruling on a motion for summary

12    judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The evidence relied

13    upon at summary judgment must be able to be "presented in a form that would be admissible in

14    evidence." *See* Fed. R. Civ. P. 56(c)(2). Thus, "[a]n affidavit or declaration used to support or

15    oppose a motion must be made on personal knowledge, set out facts that would be admissible in

16    evidence, and show that the affiant or declarant is competent to testify on the matters stated."

17    Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602. Documents submitted in support or

18    opposition of summary judgment must be authenticated through personal knowledge, must be

19    attached to an affidavit that meets the requirements of Rule 56(c)(4), and the affiant must be a

20    person through whom the exhibits could be admitted into evidence. *Orr*, 285 F.3d at 773-74;

21    Fed. R. Civ. P. 56(c)(4).

22    Evidence or testimony on matters that require "'scientific, technical, or other specialized

23    knowledge' must be introduced through an expert witness pursuant to Federal Rule of Evidence

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 13

702 and cannot be introduced through lay witnesses." *Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *1 (D. Or. Aug. 14, 2024); *Hailey v. Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *5 (D. Or. Sept. 20, 2024) (study cited by plaintiffs could not be considered because "the inferences Plaintiffs wish for this Court to draw must be the subject of expert testimony, and Plaintiffs have not presented anyone who is capable of testifying to these contentions").

        1.    <u>Plaintiff's Motion to Strike</u>

        Plaintiff asks the Court to strike paragraph 23 from Teresa Cummins' declaration and to disregard portions of Katie Gerard's declaration on the grounds they seek to improperly offer scientific opinions regarding vaccines. Dkt. 20, 10-11; *see also id*. 12-13. The Court denies the motion as the testimony is based on personal knowledge and expertise, is relevant to the undue hardship analysis, and relies on public health data and guidance available during the pandemic.

        Teresa Cummins, a Registered Nurse and Director of Health and Safety at the Port, is experienced in developing and implementing safety policies and procedures for a medical team's response to dangerous pathogen outbreaks that could impact patients, families, and healthcare workers. Dkt. 15, Cummins Decl., ¶2. During COVID-19, she evaluated information and guidance from public health authorities; developed and implemented health and safety procedures and policies at the Port; and conferred with the Port's Executive Team regarding the effectiveness and feasibility of non-vaccination safety measures, such as masking, social distancing, and testing. *Id*., ¶¶4, 6-8; ¶¶23-24. Ms. Gerard is Senior Director of Human Resources and part of the Executive Team that evaluated public health information and data, guidance from public health authorities (*e.g.*, the King County Department of Health, the Washington State Department of Health, and the CDC), requirements from workplace safety

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 14

1    authorities (*e.g.,* WISHA, OSHA, and the Washington State Department of Labor & Industries),

2    and best practices developed by other employers to guide the development of safety procedures

3    and policies at the Port. Dkt. 16, Gerard Decl., ¶2. She is competent to testify based on her

4    personal knowledge and experience regarding the risk factors considered by the Port in

5    evaluating Ms. Efimoff's accommodation request. *Id.*, Gerard Decl., ¶¶9, 13-17.

6        Testimony explaining the public health data and guidance considered by the Port is not

7    improper non-expert testimony as neither witness purports to establish the accuracy of the public

8    health guidance and data available to the Port at the time of its assessment. Moreover, the Port

9    was entitled to rely on guidance from public health authorities to assess workplace risks. *See*,

10   *e.g.*, *Slater v. Behavioral Health Resources*, 2024 WL 4290289, at *2 (W.D. WA. Sept. 25,

11   2024) ("Relying on guidance from public health authorities, Behavioral Health considered

12   whether Ms. Slater could safely perform her job duties with the accommodations of wearing a

13   mask, socially distancing, and testing for COVID-19 without putting the health and safety of

14   other co-workers and patients at risk.").

15       2.    The Port's Motion to Strike

16       The Port moves to strike portions of Ms. Efimoff's declaration (Dkt. 21, p. 3, ll. 7-9) (and

17   corresponding references in her response brief) as to whether she has ever had or transmitted

18   COVID-19. While Ms. Efimoff is competent to testify as to whether she felt sick or missed

19   work, she fails to show she is qualified to render an opinion about the health and safety risks she

20   posed to her coworkers and others due to her unvaccinated status. *See, Slater*, 2024 WL

21   4290289, at *5.

22       The Port also moves to strike assertions by Ms. Efimoff's counsel on the grounds they are

23   unsupported and not admissible evidence. *See*, *e.g.*, Dkt. 20 at 22 (unsupported assertion

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 15

1  regarding vaccination requirements); *id.* at 28 (unsupported assertion regarding liability). The

2  Court grants the motion. To defeat a motion for summary judgment, a plaintiff must do more

3  than rely on unsupported conjecture or conclusory statements. *See Anderson v. Liberty Lobby,*

4  *Inc.*, 477 U.S. 242, 249–52 (1986); *Nissan Fire & Marine Ins. Co., v. Fritz Cos.*, 210 F.3d 1099,

5  1103 (9th Cir.2000).

6       The Port also moves to strike references in Ms. Efimoff's response brief to hyperlinked

7  materials. *See*, *e.g.* Dkt. 20, 1-9, 11, 15-19, 23-27 & nn.1-31, 33-37 (links to studies, reports, and

8  articles). The Port contends that these internet materials cannot be considered at summary

9  judgment because they concern medical and scientific facts about COVID-19, vaccines, and

10  other safety measures, which require expert testimony. Fed. R. Evid. 701(c). The Court agrees.

11      Ms. Efimoff has identified no expert witnesses in this case and provides no expert

12  testimony on the content of the scientific facts she is attempting to introduce in her response brief

13  through hyperlinks to articles and studies. Ms. Efimoff provides no explanation for why she did

14  this rather than attaching these documents as an exhibit to a qualified declarant. For example,

15  Ms. Efimoff baldly asserts "vaccines can cause cancer and other medical problems" and cites

16  generally to a hyperlinked article. Dkt. 20 at 9 fn. 8. Elsewhere in her response brief, Ms.

17  Efimoff's counsel argues that any remaining risk after the Port implemented safety protocols

18  such as testing and masking presents "a low probability Ms. Efimoff would infect another

19  person" and "herd immunity" would have allowed Ms. Efimoff and other unvaccinated

20  employees to continue to work without undue hardship. Dkt. 20 at 17-19, nn. 21-27. Even if the

21  hyperlinked materials support Ms. Efimoff's assertions, the Court cannot draw these inferences

22  as they are based on scientific evidence, which must be the subject of expert testimony and Ms.

23  Efimoff has not presented anyone capable of testifying on matters concerning medical and

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 16

1    scientific facts about COVID-19, vaccines, and other safety measures.[1]

2    The materials are also inadmissible hearsay as they are offered to prove the truth of the

3    matter asserted and Ms. Efimoff provides no hearsay exception. *See*, *e.g.*, *Hailey*, 2024 WL

4    4253238, at *5-6 (reports, studies, and articles hyperlinked in plaintiff's brief were hearsay and

5    inadmissible because offered to prove truth of matter asserted with no hearsay exception);

6    *Lavelle-Hayden*, 2024 WL 3822712, at *5-7 (same).

7    Accordingly, the Court has not considered the hyperlinked internet materials and other

8    unsupported scientific assertions for purposes of summary judgment. *See*, *e.g.*, *Orr*, 285 F.3d at

9    773; *Lavelle-Hayden*, 2024 WL 3822712, at *5-7; *Hailey*, 2024 WL 4253238, at *5-6.

10   C.    Accommodation of Religious Beliefs Under Title VII and the WLAD

11   Title VII and WLAD prohibit employers from discriminating against an employee based

12   on the individual's "religion" and "creed," respectively. 42 U.S.C. §2000e–2(a) ("religion");

13   RCW 49.60.180 ("creed"). One religious discrimination theory is that the employer

14   discriminated by failing to accommodate the employee's religious beliefs. *Peterson v. Hewlett-*

15   *Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Ms. Efimoff claims the Port unlawfully failed to

16   accommodate her religious objection to the COVID-19 vaccine requirement. Dkt. 1-1 at 5-6.

17   Courts apply a two-part framework to analyze religious discrimination claims based on a

18   failure to accommodate theory. *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215,

19   1222 (9th Cir. 2023) (Title VII); *Kumar v. Gate Gourmet Inc.*, 180 Wash.2d 481 (Wash. 2014)

20

21   _____

[1] Ms. Efimoff's general references to the attached materials also provides no help to the Court in

22   determining whether the documents cited in her footnotes stand for what she claims they do. It is
     not this Court's task "to scour the record in search of a genuine issue of triable fact." *Forsberg v.*

23   *Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required
     to comb the record to find some reason to deny a motion for summary judgment.").

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 17

1  (WLAD). First, the employee must set forth a prima facie case of discrimination, which requires

2  the employee to show: (1) they had a bona fide religious belief, the practice of which conflicts

3  with an employment duty; (2) they informed their employer of the belief and conflict; and (3) the

4  employer discharged, threatened, or otherwise subjected them to an adverse employment action

5  because of their inability to fulfill the job requirement. *Peterson*, 358 F.3d at 606. If the

6  employee establishes a prima facie case, the burden shifts to the employer to "show that it was

7  nonetheless justified in not accommodating the employee's religious beliefs or practices."

8  *Bolden-Hardge*, 63 F.4th at 1222; *accord Kumar*, 180 Wash.2d at 501. The employer can meet

9  its burden by showing it initiated good faith efforts to accommodate the employee's religious

10 practices or that it could not reasonably accommodate the employee without undue hardship.

11 *Peterson*, 358 F.3d at 606.

12        For purposes of this motion, the Port assumes Ms. Efimoff has a bona fide religious

13 belief. The Port contends it is entitled to summary judgment because accommodating Ms.

14 Efimoff would have imposed an undue hardship on the Port.

15        1.    Undue Hardship Defense

16        Title VII "requires employers to accommodate the religious practice of their employees

17 unless doing so would impose an 'undue hardship on the conduct of the employer's business.'"

18 *Groff v. DeJoy*, 600 U.S. 447, 453-54 (2023) (quoting 42 U.S.C. § 2000e(j)); *Kumar*, 180 Wn.2d

19 at 496 (noting that Washington courts look to Title VII cases for help interpreting the WLAD).

20 The "undue hardship" defense is a complete defense to WLAD and Title VII failure-to-

21 accommodate claims. *See* 42 U.S.C. § 2000e(j); *Kumar*, 180 Wn.2d at 501–02.

22        To establish an undue hardship, the employer must prove "that the burden of granting an

23 accommodation would result in substantial increased costs in relation to the conduct of its

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 18

1   particular business." *Groff*, 600 U.S. at 470 (citation omitted). Courts must consider all relevant

2   factors in the case at hand, "including the particular accommodations at issue and their practical

3   impact in light of the nature, 'size and operating cost of [an] employer.'" *Id*. at 470–71. Courts

4   consider economic and non-economic costs, including safety and health risks. *See Suarez v.*

5   *Washington*, 552 P.3d 786, 798-99 (Wash. 2024) (citing *Groff*, 600 U.S. at 469*)* ("[T]he analysis

6   of an 'undue hardship' defense is not simply a financial or monetary loss calculation.");

7   *O'Hailpin v. Hawaiian Airlines, Inc*., 583 F. Supp. 3d 1294, 1310 (D. Haw. 2022); *EEOC v.*

8   *GEO Grp., Inc*., 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a

9   genuine safety or security risk can undoubtedly constitute an undue hardship."). Thus, courts

10   have found an undue hardship if the proposed accommodation would cause or increase safety

11   risks or the risk of legal liability for the employer and if the proposed accommodation would

12   create an undue hardship on coworkers or require preferential treatment on the basis of religion

13   to the detriment of other protected classes. *See, e.g.*, *Suarez,* 552 P.3d at 799-800; *Lavelle-*

14   *Hayden*, 2024 WL 3822712 at *10 ("Consistent with the pre- and post-*Groff* authority, this Court

15   holds that it is appropriate to consider not only calculable economic costs but also non-economic

16   costs, like the cost to an employer's mission and potential safety risks, in analyzing undue

17   hardship."); *Bordeaux v. Lions Gate Ent., Inc*., No. 22CV04244SVWPLA, 2023 WL 8108655, at

18   *14 (C.D. Cal. Nov. 21, 2023) ("Numerous courts have found the possibility of an unvaccinated

19   individual getting others sick to be a non-speculative risk that a court may consider when

20   performing an undue hardship analysis.").

21       In the COVID-19 context, courts also consider the proposed accommodation's

22   administrative burden of testing, especially when facing a shortage of test kits, and difficulties of

23   scheduling shifts. *See, e.g.*, *O'Hailpin*, 583 F. Supp. 3d at 1309-10. The EEOC advises that

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 19

1    "[c]osts to be considered include not only direct monetary costs but also the burden on the

2    conduct of the employer's business – including, in this instance, the risk of the spread of

3    COVID-19 to other employees or to the public."[2] According to the EEOC, certain common and

4    relevant considerations during the COVID-19 pandemic include, whether the employee

5    requesting a religious accommodation to a vaccine requirement works outdoors or indoors,

6    works alone or in a group setting, has close contact with other employees or members of the

7    public (especially medically vulnerable individuals). Another relevant consideration is the

8    number of employees seeking a similar accommodation, *i.e.*, the cumulative cost or burden on

9    the employer. *Id*.

10        Courts within the Ninth Circuit recognize that "it is appropriate to confine the [undue

11    hardship] analysis to the information available to the employer when it made its undue hardship

12    decision." *See*, *e.g.*, *MacDonald v. Oregon Health & Sci. Univ.*, No. 3:22-CV-01942-IM, 2024

13    WL 3316199, at *7-12 (D. Or. July 5, 2024); *Snow v. Women's Healthcare Assocs., LLC*, No.

14    3:23-CV-01393-IM, 2024 WL 3640111, at *8-9 (D. Or. Aug. 2, 2024); *Lavelle-Hayden*, 2024

15    WL 3822712 at *10-16. In addition, "Title VII case law is clear that 'an employer is not required

16    "to wait until it feels the effects" of the proposed accommodation before determining its

17    reasonableness.'" *Id.* a *16 (citing *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307,

18    317 (4th Cir. 2008)).

19        Federal courts have found that "masking, periodic testing, and social distancing"

20    requested by the unvaccinated employees as an accommodation is an undue hardship because:

21    (1) social distancing from other staff, patients, and visitors is not always practicable; (2) testing

22

23    _____

    [2] *See*, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-
    rehabilitation-act-and-other-eeo-laws.

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 20

1    is inadequate because, among other reasons, it misses infections on days not tested and conveys a

2    false sense of security to healthcare workers; (3) vaccinated employees who become infected

3    with COVID-19 are at least 50% less likely to transmit infection compared to unvaccinated

4    people; . . . . [and (4) the hospital needs to] minimize staff absences, so that [its] workforce [can]

5    continue to combat the COVID-19 pandemic. *Together Emps. v. Mass. Gen. Brigham Inc*., 573

6    F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022); *Lavelle-Hayden*, 2024

7    WL 3822712, at *13-16 (testing and PPE are "safety measures with proven flaws that only

8    vaccination could remedy" and allowing unvaccinated employees to continue working, even with

9    such safety measures in place, would have imposed undue hardship); *Slater*, 2024 WL 4290289

10   at *4-5) (same); *Petersen*, 2024 WL 278973 at *6-7 (same).

11            2.    <u>The Port Has Successfully Demonstrated Undue Hardship</u>

12            Considering the admissible evidence, the Port has demonstrated it could not reasonably

13   accommodate Ms. Efimoff without due hardship. Ms. Efimoff has failed to point to admissible

14   evidence to the contrary.

15            The unchallenged summary judgment evidence reflects the Port is an essential employer

16   with a massive influence on regional transportation and commerce. In 2021, the Port's focus was

17   on implementing policies and making decisions aimed at protecting its employees and

18   community against COVID-19 and maintaining business operations that had been severely

19   disrupted by the worldwide pandemic. Dkt. 15, Cummins Decl. ¶¶4-24; Dkt. 18, Metruck Decl.

20   ¶¶2, 4; Dkt. 16, Gerard Decl. ¶¶4-7. Throughout the pandemic, the Port's management monitored

21   and relied upon guidance and data from the CDC, King County DOH, L&I, and Washington

22   DOH, as well as internal Port of Seattle workforce data. Dkt. 15, Cummins Decl. ¶¶4, 15, 18, 21,

23   23-24; Dkt. 16, Gerard Decl. ¶¶4, 9.

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 21

1    In November 2021, the Port concluded it would not be able to accommodate Ms. Efimoff

2    in performing her Senior Access Controller duties unvaccinated without imposing an undue

3    hardship on the Port "by negatively impacting workplace safety and posing a threat to the health

4    and safety of employees and their families, the community, visitors, and others who spend time

5    in Port facilities." Dkt. 16, Gerard Decl. ¶17, Ex. F. In reaching this conclusion, the Port

6    considered (i) scientific data establishing that an unvaccinated individual was more likely to

7    contract COVID-19, transmit it to others, and were at greater risk of severe infection to

8    themselves; (ii) the nature of Ms. Efimoff's job duties required her to be physically present at the

9    extremely busy SeaTac airport and to come into contact with other Port employees, tenant

10   employees, vendors, and others who spend time at the airport; and (iii) the insufficient

11   protections that masking and COVID-19 testing would provide for unvaccinated employees and

12   everyone with whom they interacted. Dkt. 16, Gerard Decl. ¶¶13- 17; Dkt. 15, Cummins Decl.

13   ¶¶18, 23-24; Dkt. 16, Gerard Decl., Ex. E; Dkt. 19, Witzman Decl. ¶¶4-7.

14        The Port's conclusions are supported by the expert testimony of Dr. John Lynch. Dr.

15   Lynch is a board-certified physician in infectious disease, Professor of Medicine at the

16   University of Washington School of Medicine, and Associate Medical Director of Harborview

17   Medical Center, where he is responsible for the medical center's infection prevention and

18   control. Dkt. 17, Lynch Decl. ¶¶2-5, Ex. A. As Lead for the Medical-Technical Team for UW

19   Medicine's COVID-19 Emergency Operations Center, Dr. Lynch guided UW Medicine's

20   response to the COVID-19 pandemic, including UW Medicine's decision to require COVID-19

21   vaccination for clinical employees. *Id*.

22        Dr. Lynch testified that: (1) requiring COVID-19 vaccination was the best means by

23   which the Port could slow the spread of COVID-19 and prevent serious illness or death and that

"[n]o other public health strategy could effectively meet the Port's goals of maintaining critical

governmental services and operations while protecting the health, safety, and well-being of Port

of Seattle employees and the public at large" (*id*. ¶56; *id*. ¶¶43-45, 48, 52-56); (2) mitigation

techniques such as masking, testing, and social distancing are inferior to vaccination and even

with such safety measures in place, an unvaccinated person posed materially higher risks of

contracting COVID-19, transmitting COVID-19 to others, and developing severe disease,

compared to a vaccinated person (*id*. ¶¶37-43, 69-74, 77-78); (3) based on the information and

evidence available in fall 2021, it was reasonable for the Port "to conclude that an unvaccinated

individual in an airport and at security access points posed a risk of transmitting COVID-19 to

others in the facility (*id*. ¶68); and (4) given Plaintiff's job duties, the Port "would have

significantly increased the risk" that Plaintiff would infect Port workers and/or members of the

public with COVID-19 or contract COVID-19 herself if it had allowed her to work unvaccinated

(*id*. ¶¶65-78). Dr. Lynch evaluated the Port's decision based on the evidence available to it at the

time. *Id.*, Lynch Decl., ¶¶52, 55, 60, 68, 78. He further supported the validity of the Port's

decision using current medical and scientific evidence. *See id.*, ¶¶28, 55, 60, 62, 68.

In response, Plaintiff offers her declaration that she followed the Port's safety measures

including sanitizing her work area and equipment and wearing a mask; she never called in sick

with COVID or tested positive for COVID; there were four vaccinated persons in her department

who later became infected with COVID; she worked with 16 to 17 people per shift; she worked

two days outside and three days inside; they worked in pairs; and she ate alone or in her car. Dkt.

21, Efimoff Decl. However, Ms. Efimoff offers no admissible evidence to undermine the

medical and scientific evidence presented by the Port regarding her job duties and the Port's

conclusion that performance of those duties would result in increased health and safety risks. As

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 23

previously noted, Ms. Efimoff is not qualified to render an opinion about the health and safety risks she posed to her coworkers and other visitors to the Port due to her unvaccinated status.

M. Efimoff also does not challenge that performance of the essential functions of her position required her to work in close proximity with coworkers and Port visitors, mostly in an indoor environment. *See* Dkt. 20 at 3 (declining to dispute the Port's fact section regarding Plaintiff's job duties)) and Dkt. 13 (citing declarations, exhibits, and deposition testimony)); and (2) when working indoors, she was required to interact closely with coworkers and persons entering secure areas and move through the terminal area for inspection purposes (*id.* 2-3); and (3) she used communal eating, locker, meeting, and restroom facilities (*id.*). *See also* Dkt. 21, Efimoff Decl., ¶¶8-11.

Nonetheless, Plaintiff contends she could have been accommodated by assigning a coworker to perform any duties that required close interaction with others, while she stood at a distance (presumably because she and her coworkers "worked in pairs when someone needed to be patted down . . ."). Dkt. 20 at 22. This proposal is not a reasonable accommodation, as it would require the Port to relieve her of performing essential functions of her position, and to instead assign them to a coworker (who presumably would be unavailable to perform other duties while assisting Plaintiff). As courts have recognized in the disability accommodation context, the law does not "require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1089 (9th Cir. 2008); *Antredu v. Massachusetts Dep't of Youth Servs.*, No. CV 22-12016-WGY, 2024 WL 1539725, at *5 (D. Mass. Apr. 9, 2024) (applying same principle in context of COVID-19 religious accommodation claim).

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 24

Ms. Efimoff also suggests she could have been accommodated because she wore a mask and self-tested and the Port could have allowed her to stay home when she was sick. *See e.g.,* Dkt. 14, Phillips Decl., Efimoff Dep. 129:5-130:7. However, Dr. Lynch confirms that regular COVID-19 testing "is not sufficient" to prevent the spread of the virus for several reasons. Dkt. 17, Lynch Decl. ¶¶37-40, 43, 69-74. Antigen (rapid) COVID-19 tests produce false negatives; to the extent they are accurate, they capture the infection status of an individual for only that moment in time; PCR tests have delayed results and a person, while waiting for their test result, would be working with others and potentially transmitting COVID-19; and there were shortages of rapid antigen tests during the Delta wave of the pandemic. *Id*. As for masking, one limitation to a masking requirement is that the employer's masking requirement only applies when the employee is at work, unlike vaccination, and masks, like other PPE, only work when on and used correctly and only "shore up protection on the outside." *Id.*, Lynch Decl. ¶¶41, 43; *see also* Dkt. 14, Phillips Decl., Efimoff Dep. 76:1-19 (employees took masks off to eat or drink). Vague musings by Plaintiff's counsel about shift-swapping (*see* Dkt. 20 at 22-23) are not evidence and do not raise a question of material fact regarding the Port's undue hardship defense. The undisputed evidence is that Ms. Efimoff's job required her to work closely with coworkers, visitors, and other workers, often in indoor environments. Dkt. 13, 2-3. The undisputed expert testimony establishes that Ms. Efimoff's unvaccinated status, combined with her job duties and work environment, resulted in an increased risk that she would acquire COVID-19 and transmit it to others. *Id*. 18-20; *see* Lynch Decl. ¶¶65-78. Ms. Efimoff offers no competent evidence to the contrary.

Plaintiff's counsel also argues an employer must conduct an unscientific workplace "study" of what it observes in the workplace about an invisible virus; and if the employer is

1    unable to replicate the work of medical and scientific authorities regarding the likelihood of

2    contracting and transmitting a deadly virus based on vaccination status, the effectiveness of

3    various methods of reducing the spread of the virus, and the risks of transmission attendant to

4    certain environments and activities, the employer should reject reputable public health guidance

5    and instead accommodate unvaccinated employees. Dkt. 20 at 8-9, 14, 18-19, 24. Plaintiff's

6    counsel offers no admissible evidence or legal authority to support the novel theory that an

7    employer's observations about COVID-19 in its workplace are a valid reason to ignore

8    information from reputable public health authorities based on actual science. *See*, *e.g., Petersen*,

9    2024 WL 278973 at *3, 6-7 (finding undue hardship where employer relied on public health

10   authority and data to make decision, rather than an internal "study" of employee transmission,

11   and offered supporting expert testimony on summary judgment); *Slater*, 2024 WL 4290289, at

12   *2, 4-5 (same); *Mohamed v. Full Life Care*, 2024 WL 4371584 at *2 (W.D. Wash. Oct. 2, 2024)

13   (same).

14           Plaintiff's counsel takes data maintained by the Port regarding employees who reported

15   testing positive for COVID-19, and offers his own assumptions and calculations, which he asks

16   the Court to accept as evidence of the risk posed by unvaccinated employees. *See* Dkt. 20, 23-24.

17   Counsel is not qualified to render an opinion on a matter requiring expert knowledge, and his

18   inadmissible, unsupported assertions do not establish a genuine issue of material fact. Moreover,

19   an employer is not required to reject valid scientific evidence from credible public health

20   authorities based on what a single employee self-reports regarding presumed infection of

21   transmission. Although Plaintiff believes she never had COVID-19, Dr. Lynch notes she may

22   have been asymptomatic, declined to test when sick, or had a false negative. Dkt. 17, Lynch

23   Decl., ¶¶37-39, 71-74. Moreover, Title VII and the WLAD do not require the Port to observe

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 26

Plaintiff contracting and transmitting COVID-19 to a coworker or member of the public before determining she could not be reasonably accommodated. *See Lavelle-Hayden*, 2024 WL 3822712, at *16 (employer does not have to take a wait and see approach); *Williams v. Legacy Health*, No. 3:22-CV-06004-TMC, 2024 WL 3993162, at *7 (W.D. Wash. Aug. 29, 2024) (rejecting plaintiffs' attempt to challenge undue hardship defense by arguing employer should have pointed to specific instances where unvaccinated plaintiffs caused COVID-19 transmission).

Plaintiff's counsel infers the Port mistakenly refers to 20,000 and elsewhere to 2,200 employees and concludes this error skews any calculations as to the danger posed by an unvaccinated worker. However, the 20,000 figure comes from Steve Metruck's declaration, which states "[t]he airport operations are supported by the work of approximately 20,000 employees[] working for the Port, contractors, airlines, the TSA, and others. Dkt. 18, Metruck Decl., ¶2. Thus, that figure is larger than the number of actual Port employees, which is closer to 2,200. *Id.*, ¶3. Plaintiff's counsel tries to use these numbers to support his own inadmissible, unqualified assertions about the dangers of COVID-19 in Ms. Efimoff's work environment. *See* Dkt. 20, at 9, 17-18. The record reflects the cumulative cost of accommodating all employees who requested religious accommodations would have been substantial, even if such employees only account for roughly 5% of the Port's workforce. This arrangement would have left 114 employees unvaccinated, "relying on safety measures with proven flaws that only vaccination could remedy." *Lavelle-Hayden*, 2024 WL 3822712, at *16. The unrefuted evidence shows that an unvaccinated employee interacting with the public or coworkers or using a shared breakroom or restroom in the workplace would pose heightened risks of infection and transmission of COVID-19, compromising both employee and public safety. *See*, *e.g.*, Dkt. 17, Lynch Decl.,

¶¶37-43, 48, 52, 66-69, 77-78; *Lavelle-Hayden*, 2024 WL 3822712, at *13-14, 16; *Petersen*, 2024 WL 278973, at *6-7; *Slater*, 2024 WL 4290289, at *4-5; *MacDonald*, 2024 WL 3316199, at *8-9, 11-12. "One need only multiply these interactions by [114] to see the error" in Plaintiff's assertion. *Lavelle-Hayden*, 2024 WL 3822712, at *16 (citing *Peterson*, 2024 WL 278973, at *7).

Ms. Efimoff also complains the Port failed to present evidence that it required all contractors, airlines, TSA and/or other businesses functioning on site or visiting on site to be vaccinated. Dkt. 20 at 22, 24 & n.29. However, the focus in a Title VII and WLAD religious accommodation case is on the employee seeking an accommodation and whether accommodating the individual would be an undue hardship. *See Peterson*, 358 F.3d at 606; *Kumar*, 325 P.3d at 203. Information about the vaccination status of persons who are not employed by the Port says nothing about the undisputed evidence of the risks attendant to Ms. Efimoff's performance of her job duties while unvaccinated.

In summary, Dr. Lynch's undisputed expert testimony establishes the Port was correct in its assessment of the greater risk Ms. Efimoff had of acquiring and transmitting COVID-19, the risks attendant to Ms. Efimoff's job duties and work environment, and the best safety measure to reduce transmission of COVID-19 from her to others. *See*, *e.g.*, Dkt. 17, Lynch Decl. ¶¶56, 65-78; and *Slater*, 2024 WL 4290289, at *2, 4-5 (employer explained why accommodating the unvaccinated plaintiff would have imposed substantial health and safety risks to its patients and her coworkers, and expert Dr. Lynch affirmed employer's conclusion). Dr. Lynch's unopposed expert testimony and the public health and information and guidance available to the Port in November 2021 establish that Ms. Efimoff was more likely to get and transmit COVID-19 to her coworkers and the public because she was unvaccinated, and her job duties and work environment increased that risk. At the time of the Port's accommodation decision, King County

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 28

had just experienced the COVID-19 spike associated with the Delta wave, in which cases,

hospitalizations, and deaths reached some of the highest points in the pandemic. *See id*. ¶¶48, 52.

Based on this information, the Port "reasonably concluded that allowing unvaccinated employees

to have direct, in-person contact with [the public] and employees posed a substantial increased

cost" on its operations. The Port properly made its accommodation decision after evaluating

public health data and guidance related to transmission and infection rates associated with

unvaccinated individuals and assessing those risks in the context of Ms. Efimoff's job duties and

work environment. *See*, *e.g.*, *Lavelle-Hayden*, 2024 WL 3822712, *11-16; *MacDonald*, 2024

WL 3316199, *7-12 (D. Or. July 5, 2024); *Snow*, 2024 WL 3640111, *6-9; *Slater*, 2024 WL

4290289, at *4-5; *Mohamed*, 2024 WL 4371584, *2-3; *Hailey*, 2024 WL 4253238, *10-15;

*Williams v. Legacy Health*, 3:22-CV-6004-TMC, 2024 WL 3993162, *6-8 (W.D. Wash. Aug.

29, 2024).

<u>CONCLUSION</u>

While the Court "must resolve any factual issues of controversy in favor of the non-

moving party," it does so only if "the facts specifically averred by that party contradict facts

specifically averred by the movant." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888

(1990) (internal quotations omitted). The Court cannot draw any evidentiary inferences in favor

of Plaintiff based on inadmissible and unsupported evidence. On the record before the Court, no

reasonable jury could find against the Port's undue hardship defense. Considering the

information available to the Port at the time and Ms. Efimoff's job duties, the Port has

demonstrated that reasonably accommodating Ms. Efimoff would have resulted in undue

hardship. Ms. Efimoff failed to point to issues of material fact or provide competent evidence to

the contrary on this issue.

1    The Port has shown it is entitled to a judgment as a matter of law as the undue hardship

2    defense is a complete defense to WLAD and Title VII failure-to-accommodate claims. *See* 42

3    U.S.C. § 2000e(j); *Kumar*, 180 Wn.2d at 501–02.

4    Accordingly it is **ORDERED**:

5    1)    The Port's Motion for Summary Judgment (Dkt. 13) is **GRANTED**;

6    2)    Plaintiff's claims are **dismissed with prejudice**.

7    DATED this 13th day of November, 2024.

8

9

10   BRIAN A. TSUCHIDA
     United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER GRANTING DEFENDANT PORT OF
SEATTLE'S MOTION FOR SUMMARY
JUDGMENT - 30